IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| ALFRED PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 13-0525-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Alfred Perry seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff can perform light work, and (2) failing to include limitations regarding plaintiff's left dominant hand in the hypothetical to the vocational expert. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   BACKGROUND

On November 19, 2010, plaintiff applied for disability benefits alleging that he had been disabled since October 29, 2010. Plaintiff's disability stems from weakness in his hands. Plaintiff's application was denied on March 24, 2011. On June 1, 2012, a hearing was held before an Administrative Law Judge. On June 13, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 10, 2013,

the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the

courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

Yes = not disabled.
No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.     THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise

Waddell, in addition to documentary evidence admitted at the hearing.

## A.     ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

## Earnings Record

The record shows that plaintiff earned the following income from 1974 through

2011:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1974 | $   444.24 | 1993 | $  0.00 |
| 1975 | 1,418.64 | 1994 | 2,574.27 |
| 1976 | 3,455.39 | 1995 | 381.65 |

| | | | |
|---|---|---|---|
| 1977 | 1,205.92 | 1996 | 0.00 |
| 1978 | 2,138.23 | 1997 | 0.00 |
| 1979 | 1,059.26 | 1998 | 0.00 |
| 1980 | 0.00 | 1999 | 1,606.66 |
| 1981 | 0.00 | 2000 | 0.00 |
| 1982 | 0.00 | 2001 | 1,217.10 |
| 1983 | 432.00 | 2002 | 0.00 |
| 1984 | 3,582.00 | 2003 | 0.00 |
| 1985 | 2,166.75 | 2004 | 0.00 |
| 1986 | 127.20 | 2005 | 0.00 |
| 1987 | 220.00 | 2006 | 0.00 |
| 1988 | 996.19 | 2007 | 0.00 |
| 1989 | 428.32 | 2008 | 0.00 |
| 1990 | 0.00 | 2009 | 0.00 |
| 1991 | 0.00 | 2010 | 0.00 |
| 1992 | 0.00 | 2011 | 0.00 |

(Tr. at 100-101).

**Disability Report - Field Office**

On December 2, 2010, M. Lavery met face to face with plaintiff in connection with his disability claim (Tr. at 105-107). M. Lavery observed that plaintiff had no difficulty with anything, including sitting, standing, walking, using his hands or writing.

**Function Report**

In a Function Report dated December 10, 2010, plaintiff reported that he spends his day as follows:

> I get up soak hands because they are stiff and cramping - exercise hands. Take meds and have breakfast. Watch television can't go out since cold weather makes hands ache. Noon - meds - soak hands and exercise and eat. Take nap.

Around 3:30 - exercise hands - meds.  Television. Night soak hands exercise hands bed.

(Tr. at 125-132).

Plaintiff reported that he needs help dressing bathing, caring for his hair and shaving.  He tries to feed himself, he tries to go to the bathroom by himself, and he tries to go to bed by himself.  Plaintiff does not go outside often because he does not have anywhere to go.  When he does go out, he walks or rides in a car and he can go out alone.  He can shop in stores for groceries once a month for about 45 minutes.

When asked to circle the abilities affected by his condition, plaintiff circled lifting, reaching, climbing stairs (due to his inability to hold onto rails), and using his hands.  He did not circle walking, sitting, or standing.  He is able to finish what he starts, he follows instructions well, and he gets along well with others.  He is able to handle stress well.

**Missouri Claimant Questionnaire Supplement**

In a Claimant Questionnaire Supplement dated January 19, 2011, plaintiff reported that he has no problems sitting, standing, bending, kneeling, squatting, climbing stairs, or reaching in any direction (Tr. at 144).  He cannot use his right hand because it won't close, but he can use his left hand "some."  He cannot grab anything with his hands.

**B.    SUMMARY OF MEDICAL RECORDS**

From October 30, 2010, to November 2, 2010, plaintiff was hospitalized at Research Medical Center (Tr. at 171-195).  Plaintiff was "acutely intoxicated" and fell down 10 to 15 stairs landing on his face.  He "was found at the bottom of the flight of

stairs on a concrete floor, surrounded by a pool of blood, minimally conscious. . . . The patient has been shot multiple times in the past and has several retained bullets. He does smoke approximately a pack of tobacco a day and does drink alcohol daily. . . . He smokes marijuana but denies other illicit drug use." Plaintiff had chest x-rays which showed no traumatic injuries. Hand x-rays showed only old healed fractures, no new fractures. X-rays of his right forearm were normal. CT scans of the abdomen and pelvis were normal. CT scan of the chest was normal. CT scans of the face showed nasal bone fractures with mild displacement, possible tooth fracture, and an old fracture of the right zygomatic area (around the cheekbone). CT scan of the head showed nasal bone fractures. CT scans of plaintiff's cervical spine, thoracic spine, and lumbosacral spine showed no evidence of acute traumatic injury to the spine but chronic degenerative changes with mild spinal stenosis at C3/4, C4/5, and C5/6. His cervical vertebrae were intact and in normal alignment with no evidence of fracture or displacement. His thoracic vertebrae were intact and normal in alignment. The lumbar vertebrae were intact and normal in alignment.

Plaintiff's lip laceration was closed, and he was given IV pain medication which was then switched to oral pain medication. "Hand pain has pretty much resolved since the incident and x-ray showed no new fractures, only old fractures." Plaintiff was ambulatory without difficulty prior to his discharge. Plaintiff was discharged with a prescription for Norco (narcotic pain reliever) and told to do hand exercises.

Two and a half weeks later, plaintiff applied for disability benefits. He had not had any reported earnings for the past ten years.

On March 5, 2011, plaintiff saw Cameron Smith, D.O., in connection with his disability claim (Tr. at 198-200). Plaintiff was taking Gabapentin and Norco at the time. Plaintiff continued to smoke. "He drinks a 6-pack of beer every other day. He has a history of drug abuse but none now." Plaintiff had no muscle atrophy. His gait was normal, he was able to heel-toe walk, walk on his heels and toes, squat, and stoop. Muscle strength was normal in both arms. Grip was "particularly weak bilaterally (minimal impairment on left and slightly more impairment on right.)" Range of motion was normal except that he could not totally close his grip on his right hand. "He is able to write appropriately. He states that he can button buttons but it is difficult." Dr. Smith assessed bilateral upper extremity numbness, tingling and discomfort. "His ability for gross and fine motor hand grip and grasp movements, particularly of the right hand involving the right 4th and 5th fingers are significantly diminished. Ability for gross and fine motor hand grip and grasp movement of the left hand are only slightly diminished. His range of motion in all of his fingers passively is normal. Actively speaking, however, he is unable to totally close and grip with his right hand, particularly with his 4th and 5th digits. . . . His ability to travel and drive a car should be normal. In a normal 8-hour workday, he states that he can sit for 6-7 hours off and on. This is appropriate. He also states that he can stand for 1 hour at a time during the day. His standing should not be limited. He states that he can only walk for 1/2 hour at a time during the day. After my examination today, I would not limit his walking either. He should be able to walk the same distance as any other healthy individual. He states that he can only lift and carry 5-10 pounds. Given the weakness of his grip, depending on what the object was, this is

probably true, particularly of the right hand. He states that he can walk 1 block before he has to rest. I would say that [he] could walk much further than this -- a normal distance, I would expect. He can walk up stairs. He does not us[e] a cane. He currently does not have a job. He said his last job was 'self-work.' Again to summarize, his only decrease in strength and range of motion is in both hands, particularly the right greater than the left; however, he is certainly able to write. I believe he could operate a computer mouse without difficulty. His biggest restriction I would say would be for only fine hand movements, again, right restricted greater than left. This restriction should not be particularly profound and at most job settings, he should be able to perform at a near normal level."

On March 10, 2011, plaintiff went to the emergency room at Truman Medical Center because he was almost out of his Gabapentin (Tr. at 239-245). Plaintiff reported consuming "three servings of alcohol weekly," smoking 1/2 pack of cigarettes per day, and he denied any drug use. Plaintiff's hand grip strength was 5/5 but he was unable to fully flex his right 3rd, 4th and 5th fingers into a fist. Plaintiff's right hand x-ray was normal except for arthritis. He was told to use ice or heat on his back, use over-the-counter ibuprofen, and continue Gabapentin and Flexeril. "STOP SMOKING! People with back pain who smoke tend to have more back pain than non-smokers."

On April 12, 2011, plaintiff saw Dr. Kathy Kinder to establish care (Tr. at 235-238). Plaintiff reported having had a heart murmur as a child. As an adult, he was shot four times -- in the left side of the head, left shoulder, chest, and right knee. Some of the bullets remain in his body but he has no residual effects from the shootings.

"Plaintiff has been taking OTC [over-the-counter] ibuprofen since he ran out of his prescriptions." Plaintiff reported a 35-year history of smoking. "He drinks two 12 packs of beer a week and about a half pint of hard liquor a week. He has used marijuana in the past; the last time he smoked it was a year ago. Pt did not mention any other drug use but labs show from ED [emergency department] visit on 7/10 urine drug screen positive for cocaine." Plaintiff's prescriptions for Norco, Flexeril and Gabapentin were refilled. As far as his hand, plaintiff had "no change in strength/functionality since October. Waiting for records from Research [Medical Center] to determine how to proceed." Plaintiff was assessed with right hand weakness, arthritis of the cervical spine, and excessive drinking. Plaintiff was encouraged to stop smoking and to limit alcohol to no more than two drinks daily.

On June 14, 2011, plaintiff saw medical student Tabitha Moe, supervised by Dr. Kathy Kinder (Tr. at 227-230). Plaintiff "considers himself to be relatively healthy. . . . Since he had his fall he has not done much exercise. . . . Pt. has 35 yr hx of smoking, he smokes about 1 pack every 3 days. He uses no other forms of tobacco. He drinks two 12 packs of beer a week and about a half pint of hard liquor a week. He has used marijuana in the past; the last time he smoked it was a year ago. Pt did not mention any other drug use but labs show from ED [emergency department] visit 7/10 urine drug screen positive for cocaine." Plaintiff had an irregular heart rhythm. A cardiac consult was ordered. He was assessed with "excessive drinking: pt counseled on negative effects of excessive alcohol, states he has the desire and willpower to quit, in the contemplative stage of cessation. LFT's [liver function tests] revealed elevated AST

and ALT at 73 and 57 respectively.  Formulated plan for patient to gradually decrease etoh consumption."  Plaintiff was encouraged to think about his smoking and the associated adverse financial and health effects.

On August 8, 2011, plaintiff saw a cardiologist for suspected Mobitz type 2.[1] Plaintiff reported a 36-year history of smoking.  "He used to do marijuana, but none in the last 10 years [This is clearly contrary to he said less than 2 months earlier when he reported he had used it a year ago].  He used to do cocaine, but none in the last seven to eight years [which is contrary to the medical records showing he tested positive for cocaine 13 months eariler].  He drinks a six-pack of beer every other day or T-12 packs in a week.  He also drinks half pint of hard liquor per week."  Plaintiff's current medications were Flexeril, Gabapentin, and Norco.  Plaintiff denied any shortness of

---

[1]In second-degree Mobitz type II heart block, some of the electrical signals do not reach the ventricles.  Some signals move between the atria and ventricles normally, while others are blocked.  On an EKG, the QRS wave (see photo below) follows the P wave at a normal speed.  Sometimes, though, the QRS wave is missing (when a signal is blocked).  Some people who have Mobitz type II need pacemakers to maintain their heart rates.



Electrocardiogram

breath. Plaintiff has had no fainting or near fainting. Plaintiff's heart rhythm was irregular with occasional skipped beats. Plaintiff had an EKG. Annette Quick, M.D., assessed (1) bradycardia (fast heart beat) with occasional ectopy[2] "which is asymptomatic," (2) increased liver function tests, (3) alcohol abuse, (4) tobacco abuse, (5) mild anemia. Plaintiff needed no further cardiac workup or treatment. "I discussed with him, he needs to stop his heavy alcohol intake and tobacco abuse. Of note, the Flexeril could cause theoretically some arrhythmias [abnormal heart beats]. He is discharged from Cardiology with followup with his primary care provider. Suspect increased LFTs [liver function tests] are due to ETOH [alcohol]."

Later that day, plaintiff was seen by Robert Chuinard, M.D., for right hand numbness and tingling (Tr. at 225-226). "He states his grip has been weaker than it used to be. He cannot fully flex his index finger; however, this is due to a previous injury with a dog bite that fractured his PIP joint. Besides numbness and tingling, he has no other complaints at this time." Plaintiff reported smoking a third of a pack of cigarettes a day. "He drinks alcohol occasionally and denies any illicit drugs." On exam plaintiff showed no symptoms in his thumb or index finger. Dr. Chuinard ordered an EMG and nerve conduction studies. "We will follow up with him after these tests have been done."

On January 5, 2012, plaintiff had an EMG of his right arm which showed mild carpal tunnel syndrome (Tr. at 219-222).

---

[2]Ectopic heartbeats are small changes in an otherwise normal heartbeat that lead to extra or skipped heartbeats. They often occur without a clear cause and are most often harmless.

On February 21, 2012, plaintiff had an MRI of his cervical spine which showed moderate spinal stenosis (narrowing) at C5-6 and C6-7 (Tr. at 217-218).

On March 8, 2012, plaintiff was seen by Azam Chizari, a nurse practitioner in the Neurosurgery Clinic at Truman Medical Center due to complaints of left-side neck pain, shoulder pain, numbness and tingling of the right hand, and occasional numbness and tingling of the right forearm (Tr. at 214-216). Plaintiff reported "occasional minimal sensation of electric shock from elbow anteriorly to his fingers; otherwise no significant pain in his arms." Plaintiff reported having some staggering with walking for about two weeks after his fall, but "that has resolved." Plaintiff reported some problems with fine motor skills on the right "such as unable to button or zipping up his cloths [sic], but not much with [his] left hand." Plaintiff was seen at the Orthopedic Clinic and "an EMG of bilateral upper extremit[ies] was ordered. He had his EMG done on January 2011 which showed mild carpal tunnel syndrome in his right hand. However, he has not followed up with the Orthopedic Clinic." Plaintiff reported that Flexeril and Norco had been helping with his pain. He was having no difficulty with bladder or bowel function. Plaintiff had not participated in physical therapy, he had not had any epidural steroid injections. Plaintiff continued to smoke a half a pack of cigarettes per day. He was drinking a 12-pack of beer and a half pint of liquor over a week, and he reported smoking marijuana on "rare occasions." He denied any shortness of breath. Plaintiff was told to stop drinking.

On exam his muscle strength was 5/5 in both arms and legs. Grip was weaker on his right side compared to the left. Plaintiff's range of motion in his neck was intact

with "some mild tenderness in the left side." Plaintiff walked normally, including heel and toe walking, without difficulty with his balance. Plaintiff's MRI showed severe degenerative changes in his cervical spine. He was assessed with neck pain and cervical spine stenosis and spondylosis,[3] right hand pain, and mild carpal tunnel syndrome in his right hand. Plaintiff was given one week of Prednisone (steroid) and told to follow up with Dr. Gianino.

On March 22, 2012, plaintiff was seen by John Gianino, M.D., in the Neurosurgery Clinic at Truman Medical Center complaining of hand numbness and weakness (Tr. at 212-213). Plaintiff described symptoms since his fall in 2010. "Since that time, he has had numbness and weakness in his hands. He initially had significant pain, which he described as a numb and burning pain in his hands. This pain has improved somewhat, but he is left with some numbness, generalized nonpainful numbness, and weakness in his hands. He has difficulty using his hands particularly on the right. He has difficulty with fine motor skills such as buttoning buttons." Plaintiff reported his current medications as Neurontin (also called Gabapentin, for nerve pain) and Flexeril, a muscle relaxer. On exam plaintiff's motor strength was normal throughout, except 4/5 strength in his hand grasp bilaterally. He had mildly reduced range of motion in his neck. He was assessed with neck pain and cervical myelopathy[4]

---

[3]Cervical spondylosis is a disorder in which there is abnormal wear on the cartilage and bones of the neck.

[4]Myelopathy describes any neurologic deficit related to the spinal cord.

secondary to C5-6 stenosis.[5]

On April 4, 2012, plaintiff was seen at Truman Medical Center for an anesthesia consultation (Tr. at 208-211). Plaintiff reported drinking eight beers per day and smoking 1/2 pack of cigarettes per day for 30 years. He reported having last used marijuana two months ago (which was almost a year and a half after his alleged onset date) and used cocaine in the past but the number of months since his last use was not reported. Plaintiff's blood work showed elevated liver enzymes. A cervical spine MRI taken on February 21, 2012, was reviewed. "The patient was reexamined on this date. The H&P [history and physical] was reviewed. There are no interval changes."

## C.    SUMMARY OF TESTIMONY

During the June 1, 2012, hearing, plaintiff testified; and Denise Waddell, a vocational expert, testified at the request of the ALJ.

### 1.    Plaintiff's testimony.

Plaintiff was 53 years of age at the time of the hearing (Tr. at 23). He has a 10th grade education (Tr. at 24). Plaintiff can read and write English, and he can do simple math calculations (Tr. at 24). Plaintiff is left handed (Tr. at 24).

_____

[5]Cervical spinal stenosis is the narrowing of the spinal canal in the neck. The spinal canal is the open area in the bones (vertebrae) that make up the spinal column. The spinal cord is a collection of nerves that runs through the spinal canal from the base of the brain to the lower back. These nerves allow us to feel, to move, and to control the bowel and bladder and other body functions. In cervical spinal stenosis, the spinal canal narrows and can squeeze and compress the nerve roots where they leave the spinal cord or it may compress or damage the spinal cord itself. The seven vertebrae between the head and the chest make up the cervical spine. Squeezing the nerves and cord in the cervical spine can change how the spinal cord functions and cause pain, stiffness, numbness, or weakness in the neck, arms, and legs. It can also affect your control of your bowels and bladder.

Plaintiff has lived with his twin sister for about five years (Tr. at 24-25). He tries to help around the house by cleaning up, doing the dishes, vacuuming, and washing clothes (Tr. at 25). Plaintiff cannot fold clothes, and he cannot cook because he is unable to hold things due to weak hands (Tr. at 25). He cannot cut things or get skillets out (Tr. at 25). Plaintiff cannot touch anything with his right hand because it is very tender and it "throbs real bad since 2010" (Tr. at 25). When describing his hands, plaintiff said:

> All my fingertips are numb. They stay numb constantly all day and all night long. They [are] just numb. They're numb now. But, my right hand is the one that I can't deal with. Driving pain would be shooting down all day and all night. I haven't ha[d] a decent night's sleep since the accident really.

(Tr. at 26).

Plaintiff's fingertips on his left hand are numb (Tr. at 26). He slipped down some stairs in 2010 and was diagnosed with irreparable nerve damage (Tr. at 26).

Plaintiff cannot do anything with his right hand (Tr. at 25). It is much worse than his left dominant hand (Tr. at 26). Plaintiff takes nerve medicine -- gabapentin (Tr. at 26). It is not helpful even though his doctor told him to keep taking it (Tr. at 26-27). Plaintiff cannot hold anything for a very long time, he cannot close his hand, he cannot pick up anything heavy (Tr. at 27). Plaintiff cannot use silverware with his right hand, although again he is left-hand dominant (Tr. at 27). Plaintiff can "barely" button his buttons and zip up zippers (Tr. at 27). It has hard to tie his shoes (Tr. at 28).

Using his right hand only, he could lift and carry "five to ten pounds at the most" (Tr. at 28). With his left hand only he can lift 20 to 25 pounds, maybe 30 (Tr. at 28, 29).

He cannot do this repetitively through the day, however (Tr. at 28). He can only do it one time (Tr. at 28-29). Plaintiff can get a gallon of milk out of the refrigerator with his left hand (Tr. at 29). He can lift a gallon of milk with his right hand but he cannot open it (Tr. at 29).

Plaintiff had surgery on his neck in April 2012, two months before the hearing (Tr. at 30). He was continuing to go to physical therapy twice a week (Tr. at 30). He cannot tell yet whether the surgery will improve his pain (Tr. at 30). The physical therapy is helping (Tr. at 31). His neck causes headaches sometimes and the pain will go down into his right shoulder blade all the way to his fingertips (Tr. at 31). He is in constant pain and it prevents him from sleeping (Tr. at 31). He gets 5 1/2 to 6 hours of sleep each night (Tr. at 31). He takes no medication to help with sleep disturbance (Tr. at 31).

Plaintiff had been taking Norco for two years, along with ibuprofen (Tr. at 31-32). The Norco dulls his pain momentarily but it does not really help (Tr. at 32). He has no side effects from any medication (Tr. at 32).

Plaintiff spends his day visiting with his brother-in-law, watching television, or listening to the radio (Tr. at 32). He goes to the nearby home of a friend to visit (Tr. at 33). Plaintiff attends church services on Sundays (Tr. at 33). He cannot sit for too long or he starts to "cramp up" (Tr. at33). He has to get up and walk around (Tr. at 33). Sometimes when he walks his balance is off (Tr. at 33). He uses a cane every now and then, about three days out of every week (Tr. at 34).

Plaintiff cannot walk an entire block -- he gets out of breath and feels dizzy (Tr. at 34). He can stand in one place for 10 to 15 minutes at the most (Tr. at 34). After that length of time, he gets nauseated and has to sit down so that he does not faint (Tr. at 35). Plaintiff testified that he has difficulty sitting, and described that difficulty as follows: "Well, when I am seated, it's because I'm relaxing, it feels kind of like at ease, but other than that, I just can't sit still. I can't sit too long [inaudible] partially sleep or something." (Tr. at 35).

Plaintiff naps for a an hour to an hour and a half about three times a week (Tr. at 35).

When asked why he has almost no reported earnings for the past 15 years, plaintiff said:

A.   Because I was working with a guy. He's a self-contractor. He owns a painting business and was working with him self-employed for the last 20, about 22 years.

Q.   I take it that there were never any tax returns filed?

A.   No sir. He was paying me, he was paying me cash.

(Tr. at 35-36). That employment situation ended about five years before the hearing because the man quit his business (Tr. at 36).

Plaintiff described his history of alcohol use as "I used to drink beer here and there. It's not nothing extensive. I've had a few beers here and there. It's not no every day thing." (Tr. at 36).

**2.    Vocational expert testimony.**

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could perform light work except that the person would be limited in fine manipulation on his non-dominant right hand (Tr. at 36-37).  The vocational expert testified that such a person could work as a mail router, DOT 222.587-038, with 2,300 jobs in Missouri and 76,000 in the country; an inserting machine operator, DOT 208.685-018, with 1,300 jobs in Missouri and 43,200 in the country; or a folding machine operator, DOT 208.685-014, with 1,700 jobs in Missouri and 46,300 in the country (Tr. at 37).

The second hypothetical was the same as the first except the person could only lift and carry ten pounds and could only occasionally handle, finger and reach with the right hand and arm (Tr. at 37).  Such a person could not work (Tr. at 38).

*V.    FINDINGS OF THE ALJ*

Administrative Law Judge Mark Dawson entered his opinion on June 13, 2012 (Tr. at 8-16).

Step one.  Plaintiff has not engaged in substantial gainful activity since November 19, 2010, his application date (Tr. at 10).

Step two.  Plaintiff suffers from the following severe impairments:  (1) degenerative disc disease with cervical stenosis at C5-C7, moderate, with myelopathy symptoms, status post recent diskectomy and fusion, and (2) right hand impairment with neuropathy (Tr. at 10).

Step three.  Plaintiff's impairments to not meet or equal a listed impairment (Tr. at 11).

Step four.  Plaintiff's subjective description of his limitations is not credible (Tr. at 13).  His allegations of severe functional limitations are out of proportion with the medical evidence.  He has had only conservative and routine treatment which suggests that his pain is well controlled with medication.  There is evidence that plaintiff has attempted to mislead or confuse the extent of his functional limitations by describing limitations with his non-dominant hand even though these functions are normally performed with the dominant hand.  Plaintiff's work history includes very low life-time earnings, significant gaps in his earnings record, and no reported yearly wages above the substantial gainful activity despite having a 35-year earnings record.  Plaintiff has not reported earned income since 2001 and testified that he worked for 22 years for a man who paid him in cash.

Plaintiff retains the residual functional capacity to perform light work except that he may only occasionally use his right hand for fine manipulation and can use his left hand frequently for fine manipulation (Tr. at 11).  Plaintiff has no past relevant work (Tr. at 14).

Step five.  Plaintiff is capable of performing jobs available in significant numbers such as mail router, inserting machine operator, and folding machine operator (Tr. at 15).  Therefore, plaintiff is not disabled (Tr. at 16).

## VI.   RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in finding that plaintiff can do light work because that is inconsistent with his lifting and carrying restrictions.

> In order to perform the full range of light work Mr. Perry must have the ability to lift and carry twenty pounds occasionally and ten pounds frequently. Given the opinion of Dr. Smith, to which the ALJ gave great weight, Mr. Perry is limited to lifting and carrying a maximum of ten pounds. Consequently, Mr. Perry is unable to perform light exertional work and the ALJ erred in formulating Mr. Perry's residual functional capacity that found him capable of performing light work.

(plaintiff's brief at p. 11).

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). Social Security Ruling 83-10 defines "frequently" as occurring from one-third to two-thirds of the time and "occasionally" as occurring from very little to up to one-third of the time. The lifting requirement is for either hand, not both hands. Gaghins v. Astrue, 2012 WL 10561 (N. D. Oklahoma, January 3, 2012) (reversed on other grounds); Gheur v. Astrue, 2008 WL 4469652 (E.D.N.Y., September 30, 2008); LeVasseur v. Barnhart, 2006 WL 777050 (D. Delaware, March 27, 2006).

Plaintiff's argument is dependent on finding that Dr. Perry limited plaintiff to lifting and carrying a maximum of ten pounds with either hand and the ALJ adopted that finding.

Dr. Smith found that plaintiff's upper extremity muscle strength was +5/5 bilaterally, and his range of motion in both arms was normal except that he could not make a fist with his nondominant right hand.

He states that he can only lift and carry 5-10 pounds. Given the weakness of his grip, depending on what the object was, this is probably true, particularly in the right hand.

(Tr. at 199-200).  Dr. Smith assigned credibility to plaintiff's statement that he can only lift and carry five to ten pounds based on the weakness of plaintiff's grip.  Plaintiff had almost no grip weakness in his left dominant hand:  "hand grip and grasp movement of the left hand are only slightly diminished." (Tr. at 199).  Dr. Smith found that plaintiff's biggest restriction was for fine hand movements, and even then he "should be able to perform at a near normal level" at most job settings.  Nothing further was said about plaintiff's ability to lift and carry.

Assessing the medical evidence, it is clear that with regard to plaintiff's left dominant hand, Dr. Smith found "only slightly diminished" grip and grasp and no reduction in range of motion or muscle strength.  Plaintiff had no muscle atrophy, which indicates that he uses his arm regularly.  Because the abnormal findings in Dr. Smith's exam were with plaintiff's right hand, it is not plausible to believe that the lifting restriction of 5 to 10 pounds applied equally to both arms.

Plaintiff testified at the administrative hearing that he could lift a gallon of milk out of the refrigerator with his right hand, which is the arm with the greater limitation.  A gallon of milk weighs approximately eight pounds.  Plaintiff testified at the administrative hearing that he could lift 20 to 25, maybe 30 pounds with his dominant left hand. Plaintiff clearly embellished his limitations during the hearing (and plaintiff does not challenge the ALJ's finding that plaintiff's subjective allegations of disabling

impairments are not credible), and despite this embellishment he testified that he can lift the amount required to satisfy the requirements of light work.

Plaintiff's treating doctors never suggested that he limit his lifting, and he never complained to any treating doctor of an inability to lift, especially to the extent he claimed to Dr. Smith in connection with his disability case. In November 2010 when plaintiff was in the hospital due to his fall, his doctors noted that he had only old fractures in his hands, not new ones. His hand pain had "pretty much resolved" only days after his fall. He was told to do exercises -- he was not told to limit his lifting. Plaintiff has no other medical records until he was directed to see Dr. Smith the following year in connection with his disability case. On December 10, 2010, M. Lavery observed that plaintiff had no difficulty using his hands. On March 10, 2011, nurse practitioner Cathy Hostettler found that plaintiff's grip strength was 5/5. His right hand x-ray was normal. On April 12, 2011, Dr. Kinder noted "no change in strength/ functionality since October" when plaintiff was released from the hospital with no lifting restrictions. Dr. Kinder assessed right hand weakness but made no abnormal findings with regard to plaintiff's left dominant hand. She recommended that plaintiff limit his drinking, limit his smoking, but not that he limit his lifting. On June 14, 2011, Tabitha Moe recommended that plaintiff limit his drinking and limit his smoking, but she did not recommend that he limit his lifting. On August 8, 2011, Dr. Chuinard saw plaintiff for his right hand condition and wrote that "besides numbness and tingling, he has no other complaints at this time." Plaintiff did not complain of problems lifting, and Dr. Chuinard did not recommend that he limit his lifting in any way. He ordered nerve conduction

studies (which showed only mild carpal tunnel syndrome on the right) but plaintiff failed to follow up with Dr. Chuinard as directed which suggests his symptoms were not so severe as to be disabling as he now alleges. On March 8, 2012, plaintiff complained to Azam Chizari of numbness and tingling in his right hand. He reported some difficulty with fine motor movements with his right hand but not much difficulty with his left. Grip strength was 5/5. He was assessed with right hand pain (not left), and mild carpal tunnel syndrome in his right hand, not his left. In fact, there were no abnormal findings with regard to his left hand or arm. He was not advised to limit lifting. On March 22, 2012, plaintiff told Dr. Gianino that he still had some generalized nonpainful numbness and weakness in his hands and that he has difficulty using his hands particularly on the right. Dr. Gianino did not advise plaintiff to limit lifting, and plaintiff did not describe any difficulty with lifting but rather with fastening buttons.

Because the medical evidence and plaintiff's hearing testimony establish that he is capable of lifting up to 20 pounds from "very little" to up to one-third of the work day, the ALJ's giving credibility to the opinion of Dr. Smith while finding that plaintiff can perform a reduced range of light work is not inconsistent.

Plaintiff next argues that the ALJ relied on an improper hypothetical because:

> He found that Mr. Perry could perform light work except that he could only occasionally use his right hand to finger and could only frequently use his left hand to finger. The hypothetical to the vocational expert, however, did not include any limitations regarding Mr. Perry's left hand, which is his dominant hand. Because the ALJ never asked the vocational expert what impact a limitation to frequent fingering with the dominant arm may have on the jobs she had given as potential other work, it is unknown whether Mr. Perry could perform these jobs or any jobs in the national economy."

Plaintiff's argument is without merit.

The ALJ found that plaintiff could only occasionally use his right hand to finger (fine manipulation) and only frequently use his left hand to finger (fine manipulation) (Tr. at 11). Plaintiff's left hand is his dominant hand. The ALJ's hypothetical to the vocational expert included the following: "[H]e would be limited in fine manipulation on his non-dominant right hand."

The Acting Commissioner argues that the ALJ's wording is not relevant because the three jobs he found that plaintiff could perform only require occasional fingering which is less than that found by the ALJ in his residual functional capacity assessment. Plaintiff disagrees, arguing as follows:

> The Commissioner argues that because the DOT indicates that the three jobs given by the vocational expert only required occasional fingering; therefore, she assumes that the vocational expert's testimony would not have changed even with the additional limitation to Mr. Perry's left hand. The Commissioner's position is based on conjecture alone. The ALJ relied on the testimony of the vocational expert and not the description given in the DOT. The vocational expert's testimony is not based solely on the information provided in the DOT but it is based on her education and experience of seeing these types of jobs actually performed in the work place. Although the DOT may indicate that only occasional fingering is required; this description may not be accurate based on the vocational expert's experience in the field. Moreover, if the job(s) could still be performed, the number of jobs available that could accommodate limitations in both hands may be significantly reduced.

Considering the evidence in the record as a whole, I find this argument without merit for multiple reasons.

First, the arguments presented by both plaintiff and defendant assume that the ALJ found some sort of limitation with plaintiff's ability to finger using his left hand. The ALJ found that plaintiff "can use his left hand frequently for fine manipulation." He did

not say that plaintiff was "limited" in the use of his left hand, and in fact he did not even find that plaintiff suffers from any impairment much less a severe impairment related to his left hand or arm.

Even if the ALJ meant to find some sort of limitation in plaintiff's ability to finger with his dominant left hand, there is not substantial evidence in the record as a whole to support such a finding. On December 2, 2010, M. Lavery observed that plaintiff had no difficulty writing with his left hand. On March 5, 2011, plaintiff had only minimal grip impairment of his left hand. He was able to write appropriately. "He is certainly able to write. I believe he could operate a computer mouse without difficulty." On that day Dr. Smith found that plaintiff had a restriction of fine motor movements more on the right than the left, and even at that his right impairment was "not particularly profound and at most job settings, he should be able to perform in a near-normal level." If he could perform at a near-normal level with his right hand, and his left hand was less restricted than that, I fail to see how this medical evidence would support any restriction of plaintiff's left dominant hand.

On March 10, 2011, his grip strength was normal. On April 12, 2011, he was assessed with right hand weakness but not left hand weakness. On August 8, 2011, he reported right hand numbness and tingling and said he had "no other complaints" including no complaints about his ability to use his left hand to finger. On March 8, 2012, he reported some problems with fine motor skills on the right hand, but not on the left. On March 22, 2012, he reported generalized nonpainful numbness and weakness on his right hand but not on his left.

Based on all of this evidence I find that the substantial evidence in the record as a whole would not support a finding that plaintiff has any restriction at all in his ability to finger with his left dominant hand, which is consistent with the ALJ's not finding that plaintiff suffers from any impairment related to his left hand. This further supports the above finding that the ALJ did not intend by his residual functional capacity wording to assess any limitation in plaintiff's ability to finger using his left hand.

Second and alternatively, although plaintiff is correct in that the ALJ relies not only on a vocational expert's testimony regarding the contents of the Dictionary of Occupational Titles but also his or her experience in the requirements of certain jobs, there is no authority for the assumption that a vocational expert's experience can establish that certain jobs require more functional capability than that outlined in the Dictionary of Occupational Titles or in Social Security Rulings. A vocational expert can testify to abilities not covered in the Dictionary of Occupational Titles (such as a sit/stand option). However, I have found no case (and plaintiff has not pointed to one) wherein a vocational expert testified that despite the Dictionary of Occupational Titles listing an ability to occasionally perform some function as being a requirement of a job, the job (in all cases) actually requires an ability to frequently perform that function.

For a claimant to be found disabled, he must be incapable of performing any job available in significant numbers in the national or regional economy. Here, it is clear that with the residual functional capacity found by the ALJ, plaintiff can perform at least three jobs, all of which require no more than occasional fingering according to the Dictionary of Occupational Titles. Plaintiff's assumption that the vocational expert may

have testified that despite the requirement in the DOT that these jobs require only occasional fingering, her experience is that they all require constant fingering[6] is not only pure speculation, it makes no sense and is contrary to law. Had the vocational expert testified that a person who can only frequently finger could not perform those three jobs, she would have been discredited with the Dictionary of Occupational Titles which clearly states that only occasional fingering is required.

Therefore, in order to succeed in his argument, plaintiff must establish that all three of the jobs found in step five of the sequential analysis require constant fingering even though the Dictionary of Occupational Titles says that they all require only occasional fingering. This he cannot do.

## VII.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 5, 2014

---

[6]"Constant" is the only frequency that exceeds "frequent," which is what the ALJ found plaintiff could do and therefore the only requirement that would result in a finding that plaintiff could not perform any of these jobs.